| 9   649
| 29  527

### ADAM THOMPSON *v.* THE STATE.

1. PRACTICE — CONSTITUTIONAL LAW. — The Constitution of this State prohibits a district judge from presiding on a trial of a case wherein he has been of counsel.

2. SAME. — And it further provides that when a district judge is disqualified by reason of any of the causes enumerated, the parties may, by consent, appoint a proper person to try said cause.

3. SAME. — Nor is this rule of practice confined to civil cases, but extends as well to criminal.

4. SAME. — And the same clause (Art. V., sect. 11) further provides that, on a failure of counsel to select, "a competent person may be appointed to try the same, in the county wherein it is pending, in such manner as may be prescribed by law."

5. SAME — APPOINTMENT OF SPECIAL JUDGE. — Art. 571, Code of Criminal Procedure, provides that, should the parties not agree upon an attorney to try the case on or before the day set for the trial of the criminal docket, "the district judge shall forthwith certify the facts to the governor, who shall at once appoint some practising attorney, learned in the law, to try such case."

6. SAME. — Art. 572 requires that "the attorney agreed upon or appointed shall, before he enters upon his duties as special judge, take the oath of office required by the Constitution of the State, and his selection by the parties, or appointment by the governor, as the case may be, and the fact that the oath of office was administered to him, shall be entered upon the minutes of the court as a part of the record of the cause, and he shall have all the power and authority of the district judge that may be necessary to enable him to conduct, try, determine, and finally dispose of the case."

7. SAME. — An agreement of counsel to appoint a special judge to try a cause should be perpetuated in writing, and such writing filed among the papers and made a part of the record.

8. SAME — CASE STATED. — Prior to making application to the executive for the appointment of a special judge to try this cause, an agreement was entered into by the State and defendant to try before B., an attorney, or other special judge. The bill of exceptions recites, however, that the county attorney, unwilling to risk the agreement, had this case certified to

the governor, who appointed the special judge. The objection urged by the defendant is that he should not be forced into trial before the judge so appointed, and that the State was bound by the agreement of counsel to select a special judge. From what appears in the record, the agreement between counsel for the State and defendant was a verbal agreement. *Held*, that the State was not bound by such agreement, and the court did not err in requiring defendant to proceed to trial before the judge as appointed.

9. FORMER JEOPARDY. — The effect of the reversal by this court of a judgment of conviction is to place the defendant in precisely the same condition as though the court below had granted a new trial, and there had been no appeal; and as in such case no final adjudication is reached, the doctrine of former jeopardy does not apply.

10. PRACTICE IN THIS COURT. — Bills of exception taken to the rulings of the court below must state the whole of the evidence on the question involved, or they cannot be revised in the absence of a statement of facts. And the same rule applies to charges of the court, whether given or refused.

APPEAL from the District Court of Dallas. Tried below before the Hon. S. ROBERTSON, Special Judge.

The appellant and one Wesley Pollard were jointly indicted for the murder of Joseph Shoemaker, in Dallas County, on the night of July 1, 1876. This is the second appeal from a conviction, with the death-penalty attached. The first is reported in 4 Texas Ct. App. 44. The record in this last appeal comes up without a statement of facts. That appended is taken from the record on the first appeal.

The following, as a preliminary to the evidence in detail, appears, signed and agreed to by the attorneys for the State and for the defence: " It is hereby agreed and admitted by the State and the defendant that in the trial of this cause the *corpus delicti* was fully proved; that the deceased, Joseph Shoemaker, was killed between the hours of four o'clock on Saturday evening, July 1, 1876, and eight o'clock next morning, in Dallas County, Texas, at the grocery-store of the deceased, about five or six miles west of the west limits of the city of Dallas, in said county and State; that the body of the said deceased was found

at eight o'clock on said morning, lying about ten feet from said grocery-store, with a mattress thrown over it; that the money-drawer belonging to the deceased's grocery-store was found in a cotton-patch near by, with a nickel in it, and that the tracks of two men were found extending from said grocery-store to the money-drawer in said cotton-patch; that one of the tracks was about a No. 9, the other not much smaller; that the right shoe of the larger track was run down and outward; that at the time of the arrest of Adam Thompson, about two weeks after the said first day of July, there was taken from his pocket a certain half-dollar coin with notches cut in it; that defendant gave no account of how he came in possession of said coin; that said coin was found to be in the possession of the deceased as late as four o'clock on the evening of the said first day of July; that deceased kept said coin as a keepsake; that from the said first day of July the defendant, together with one Wesley Pollard, concealed himself in the corn-fields and woods most of the time about the city of Dallas, until said Thompson was arrested; that during said intervening time the sheriff of Dallas County, together with several of the policemen of said city, were making diligent efforts, by day and night, to capture the said Pollard and the said Thompson, but failed until the time of the said Thompson's arrest; that the house in which Eliza Jones (colored) and Fannie Cornelius (colored) locate the defendant on the night of the 1st of July, 1876, is one and one-half miles east of the west limits of the city of Dallas."

The testimony of Eliza Jones, for the State, follows. She testified, in substance, that herself and Fannie Cornelius, on the first day of July, 1876, resided in a house about half a mile east of the court-house in the city of Dallas; that the appellant was at that house on the night of July 1, 1876, from ten o'clock until at least three o'clock. She testified positively to this fact, and identified the night as being the night before the day she heard of the killing of

Shoemaker.   She testified, further, that the appellant slept in the same house on the next night, that of July 2, 1876, occupying a bed with Fannie Cornelius.   About eleven o'clock on that night, according to her testimony, she heard Fannie Cornelius ask the appellant for some money, and distinctly heard the appellant reply, "I have no money except a twenty-dollar bill; Wesley Pollard has the change we got from the d—d Dutchman we killed."   The witness first averred that not another word was spoken in the room that night; that neither Fannie Cornelius nor appellant spoke to her that night.   On cross-examination, she testified that there was no light in the room at any time during the night.   She knew the person in bed with Fannie Cornelius to be the appellant.   She identified him by his coat, pants, and vest, which were lying on a trunk which stood against the wall, immediately under the east window, the clothes being between a dove and bluish color.   These clothes she identified by holding them up to the window.   She also identified the prisoner by a gold-colored silver ring.   She could see the color of the clothes and ring by the light of the moon shining through the window on the trunk and bed in which appellant and Fannie Cornelius were lying.   The witness took hold of appellant's hand to examine the ring. The bed was situated in the north-east corner of the room, and the window through which the moonlight entered was in the east wall, about five feet from the north wall.   The room was an underground or cellar room.

The witness further testified that, after having identified the appellant through the means indicated, she asked Fannie Cornelius who it was in bed with her, and that Fannie replied that it was none of her (witness's) business; that she (Fannie) would sleep with whom she pleased.   Witness and appellant then entered into a conversation which lasted some minutes.   This conversation occurred about ten o'clock on the night mentioned.   Immediately afterwards she went to bed, and presently heard the appellant's statement about

the killing, set out above. The witness denied having told Fannie Mays, October 18, 1876, at the court-house in Dallas, that she was " put up " to swearing against the appellant. She denied being Byron McDuffie's concubine, and denied any acquaintance with him.

The substance of the testimony of Byron McDuffie was, that on the second day of July, 1876, he had a conversation with appellant and Pollard near the railroad roundhouse in East Dallas, during the course of which Pollard handed him a ten-dollar bill, and requested him to go up town and purchase for himself and appellant some whiskey, tobacco, and ammunition, remarking at the same time that they (Pollard and appellant) had murdered the old man over the river. He gave the witness a detailed account of the killing. Pollard remarked during this conversation that only three dollars and some odd cents were obtained from the deceased, but subsequently pulled out a roll of bills, the amount of which witness did not know. During this time the appellant preserved scrupulous silence, but would frequently look uneasily towards town, as did Pollard. The latter had two six-shooters on his person. Witness returned the money to Pollard, and refused to make the purchases for him as requested. The parties then separated.

Cross-examined, the witness said that he had been convicted of theft in Marion County, Texas, in 1869, served about one year in the penitentiary, and was pardoned. It was about 12 M. when he met appellant and Pollard, on July 2, 1876. Witness denied that he ever told Clint (one of appellant's attorneys), in the presence of Oliver Bray, that, among other things, Pollard had asked him to buy a pistol. He denied that he told Fannie Mays, at Jack Harris' house, September 20, 1876, that he wanted to see appellant and Pollard hung, and was going to see that it was done. He admitted that he labored to effect the arrest of appellant and Pollard, and went several times with the officers to point them out.

Thomas Johnson, who lived five miles west of Dallas, testified that Pollard came to his house on the morning of the killing, about sunrise, and asked for horse-feed. The appellant came to the house a short time after, and presently they left together, returning in a short time with a horse. The witness was positive that Pollard came to the house first; that he asked for feed; that he brought the horse; that the horse was unsaddled; that a saddle was carried by appellant. He was certain that the day on which they came to his house was subsequent to July 4th, because a picnic was to come off a day or two afterwards, to which his wife and children were going. The parties were at his house on Saturday, but it was after the 4th. Witness was not a good judge of the days of the month, but was of the days of the week. Knows it was the day of the killing, for he heard of it next day at ten o'clock.

The substance of the testimony of Nat Walker was that the saw Pollard andhe appellant on the morning before the killing, about one and a half hours by sun, about a half-mile over the river, on foot, going towards deceased's. They told witness they were going to a pasture, near a grocery, to pay for the grazing of a horse. Witness remembers the day because it rained, and he heard of the killing next day.

James Burton testified that there was no other grocery on the road between Dallas and Shoemaker's. It rained on Saturday night, not on Saturday. Deceased usually slept in his grocery alone, but witness does not know that he slept there alone on the night of the murder. He testified that the latch of Shoemaker's door was broken.

W. M. Moon, sheriff of Dallas County, testified that the key shown him was the same found by him in a trunk at Dock Jack's house, and that out of the same trunk he got appellant's clothes. This trunk was identified as Pollard's by Dock Jack, who was present when it was examined by Moon. Jack testified that Pollard carried the key, but appellant had access to it.

B. F. Edmondson identified the key as one he let deceased have on the Tuesday before the killing.

Deputy-Sheriff Eakin testified that prior to the arrest of appellant, when he attempted to arrest him, appellant shot at him three times.

Deputy-Sheriff Jones testified that when he requested Eliza Jones to go to the court-house and tell what she knew about this case, she did not want to do so, but finally agreed to go.

Allen Johnson, nephew of Thomas Johnson, testified that he was living at the house of Thomas Johnson at the date of the killing. He remembered distinctly that appellant and Pollard came to the house on the morning of that day, a little before sun-up. He was positive that the appellant came to the house first; that it was appellant who asked for horse-feed; that the horse was not unsaddled when he was brought up to the house. He testified that there had been no picnic at Eagle Ford for months prior to the day the parties were at the house, nor was one contemplated, that he knew of; that Thomas Johnson was sick when the appellant and Pollard came to the house, and for several weeks afterwards, and could not have gone to a picnic on the 4th of July. Correcting himself in regard to the picnic, witness thought there was something of the sort. There was a dance after that date at Eagle Ford, and the family went to it.

Fannie Mays testified, for the defence, that Eliza Jones, the witness for the State, told her, in the city of Dallas, October 18, 1876, in the court-house, that she (Eliza Jones) did not come up to testify in this case of her own volition, but was put up to it by a person whom she did not name. This witness also testified that Byron McDuffie, witness for the State, on September 20, 1876, at Jack Harris' house, in Dallas, told her that he wanted appellant and Pollard hung or sent to the penitentiary, and that he intended to see that it was done. On cross-examination, she testified that a certain person told her to come and testify against appellant; that she did not want to come;

that she had not been subpœnaed by either party, and that she was not before the grand jury that found the indictment.   She denied that she had told Deputy-Sheriff Jones that she knew who did the killing, or that she had ever said she would .get Pollard out of the difficulty if she had to swear ten lies.

Oliver Bray, for the defence, testified that in October, at the court-house in Dallas, he heard Byron McDuffie state to C. L. Clint, of counsel for the defence, that Pollard gave him a ten-dollar bill on the second day of July, 1876, and requested him to purchase for him a pistol, among other things.

The reputation for truth of Eliza Jones and Byron McDuffie, State's witnesses, was pronounced bad by several witnesses, who testified that they were acquainted with their reputations.

Cleaveland, a key-maker, for the defence, testified that he had seen many keys sprung like the one handed him. The owner, well acquainted with the key, might identify it among other keys rusted and sprung like it, but it would not be probable.   He thought it would be as easy to identify a certain man among a half-dozen exactly alike. Griffin testified to the same facts.

Fannie Cornelius, for the defence, testified that she was with the appellant on Saturday night, July 1, 1876, from sundown on that day until twelve o'clock next day.   She slept with him, and knows he was in the house all night, for she awakened frequently and found him in bed with her. Cross-examined, the witness stated that appellant went to bed about ten or eleven o'clock; denied that the moon shone in her room on either Saturday or Sunday night, and denied that she slept with appellant on Sunday night. Appellant did not come to her house on that night.

*C. L. Clint*, for the appellant.   The court erred in sustaining the State's general demurrer and special exceptions to defendant's special plea of former jeopardy.

1. Because said plea of former jeopardy sets up facts which, if true, entitle appellant to discharge from legal custody.

2. Because where there is a right there is a remedy. Our State decisions of recent date establish the doctrine that jeopardy may be incurred before verdict; and where jeopardy has been thus incurred before verdict, a right arises to the party who has incurred it, and he is entitled to a remedy to enforce said right. *Vestal* v. *The State*, 3 Texas Ct. App. 648; Whart. Max., 201; *Parchman* v. *The State*, 2 Texas Ct. App. 228.

3. And the Legislature, in declaring that but two special pleas should be allowed to a defendant, — to-wit, that he had been either acquitted or convicted, — contravene a plain provision of the Constitution. Code Cr. Proc., art. 525.

4. If it were true that defendants could only resort to the two pleas mentioned in our statute against further prosecution for the same offence, the theory of jeopardy before verdict would be the merest myth, and jury after jury might be discharged before verdict, and without cause, and yet, for want of a plea, jeopardy thus incurred would be no shield to defendants.

5. A law which curtails or attempts to encroach upon a legal right guaranteed to defendants under the Constitution is void.

6. But even if the only special pleas which a defendant could interpose to a second prosecution were that he had been convicted or acquitted, appellant's plea would come within the purview of the special plea of acquittal; because, although there has been no formal verdict, yet, if there has been legal jeopardy, this is in law equivalent to a verdict of acquittal. 1 Bishop's Cr. Proc. (2d ed.), sect. 821.

7. Besides, it is further provided in our Code of Criminal Procedure that wherever our Code is deficient the common law may be invoked, and it allows this plea.         .

8. The law allows great latitude in framing a plea of

former jeopardy, with reference to substance as well as form, since there is still so great confusion and comparative obscurity surrounding the entire doctrine of jeopardy, and especially the mode of presenting defendant's claims to be discharged, when it has been incurred. 1 Bishop's Cr. Proc. 21 *et seq.*, sect. 20. The plea of jeopardy was drawn according to Bishop's forms.

There are two reasons set up in the plea of former jeopardy which make it good, either of which being sufficient to entitle appellant to a discharge. They are :—

1. The court discharged the jury without giving it in charge the law of the case. Under this head it has been decided that unless the charge of the court is marked "filed," it will be equivalent to giving no charge. In other words, submitting the case to the jury for their consideration without informing them of the law applicable to the facts. *Thompson* v. *The State*, 4 Texas Ct. App. 44.

2. And as there can be no verdict unless the law is given in charge, in legal contemplation, the jury, in cases where no charge has been given and they are permitted to retire and consider of their verdict without any charge, is considered to have been discharged before verdict; for there can be no such thing as a verdict without a charge, any more than there could be a court without a judge. And as to the question whether the discharge of a jury under such circumstances would be without cause, for two reasons we answer yes : —

(1.) Because the Constitution guarantees to a defendant, among other things, a speedy trial; and one of the strongest reasons urged in support of the law which protects a person against a second trial is, that time is the very essence of his safety; and, therefore, if courts were permitted from time to time to discharge juries without charging them, and say to defendants, "No harm shall be done you — a new trial shall be granted," this great bulwark of his safety, time, he would be robbed of. Witnesses would

die, evidence be forgotten, and a defence once strong and invincible become weakened and useless indeed. *United States* v. *Perez*, Bennett & Heard's Ld. Cr. Cas. 470.

(2.) Mr. Bishop, in his work on Criminal Law, pp. 1046, 1047, says that, as an elementary proposition, a defendant ought not to be tried a second time simply because the judge committed an error in the charge given. By parity of reason, and upon principle, if a defect in a charge be protection against a second trial, surely where no charge whatever is given, no second trial can be had.

Do we waive our right to a discharge simply because the case has been reversed? We do not; because, as will be seen from our decisions, there is no other mode in this State to seek the legal redress to which a person is entitled after having once incurred jeopardy, and to say that a reversal would deprive us of this right would be saying that we had no such right. Our reports, especially the Court of Appeals Reports, are replete with decisions to the effect that a writ of *habeas corpus* would not lie to enforce this right, and in those decisions it is intimated, as stated, that our remedy is by appeal; and the same is held in 1 Bishop's Criminal Procedure, p. 822, sects. 820, 821.

If the case is reversed on other grounds, as we expect it to be, we hope the court will intimate what the court below should do with reference to appellant's rights under the plea of former jeopardy.

The action had in this case in the court below, before S. Robertson, is *coram non judice*, and void : —

First. Because, in ordinary cases in the District Court, before jurisdiction attaches it must appear from the record that the parties and subject-matter were legally before it. 6 Pet. 729; *Sutherland* v. *De Leon*, 1 Texas, 270 *et seq*.

Second. And in cases tried before special judges in the District Court, it must further appear of record in the minutes of the cause how the person presiding in the case became special judge.

Third. And in criminal cases, in order to show *how* a person became special judge, if the authority is derived by appointment of the governor, said appointment of the governor, or the commission constituting the party special judge, should be entered of record as part of the minutes of the cause. Code Cr. Proc., art. 572.

Fourth. It will be seen from the transcript in this case that the appointment of S. Robertson as special judge was not spread upon the records, either in the minutes or elsewhere; nor is the commission of appointment transcribed into the transcript.

Fifth. The only evidence in the record of the authority of S. Robertson to act as special judge is a recital of the *fact* of his appointment by the governor, which is insufficient, since it is provided in art. 572, Code of Criminal Procedure, that the *appointment* by the governor, not the *fact* that he was appointed, must be spread upon the record as part of the minutes of the cause.

Sixth. That the mere *recital of the fact* of the appointment is not sufficient evidence of the authority of Mr. Robertson to act as special judge, is clear : —

1. Because a grammatical construction of art. 572 shows that the *commission of appointment*, and *not the fact* of the commission of appointment, should be spread upon the minutes of the cause.

2. Because the use of the word " fact " in connection with the oath of office, and not in connection with the appointment, shows that, while the mere recital of *the fact* that the oath of office was administered is sufficient as a minute, when applied to the oath, it is insufficient when applied to the appointment. Code Cr. Proc., art. 572.

3. Because every word, phrase, and clause is presumed to possess a meaning, and must be given that which is most natural and, in criminal cases, favorable to the defendant. Under this rule of construction, surely the appointment itself, and not a recital of the fact thereof, should be spread upon the record.

4. Because, by reasonable intendment, the appointment itself, and not a recital of the fact thereof, should appear of record, for the reasons : —

a. That it was never intended to permit a person, in the very minutes which he signs, and which are gotten up under his supervision, to constitute himself judge, whether his appointment, in point of fact, be legal or illegal, regular or irregular ; yet, if the mere recital of the *fact* of appointment be sufficient, such would be the effect.

b. It would preclude an investigation into the special judge's authority to preside in the cause, on the part of the Court of Appeals, if the recital of the *fact* of the appointment were held sufficient ; and this, it will readily be seen, would lead to most disastrous results. In other words, it would permit the court below to exercise an arbitrary discretion which could not be revised. Bennett & Heard's Cr. Cas. 474.

The court below erred in not sustaining appellant's objection to being tried before Judge S. Robertson, in that he and the county attorney had long since agreed upon Judge Barksdale as the special judge before whom the case was to be tried. See first exception.

1. Because, said agreement having been entered into under art. 570, Code of Criminal Procedure, nothing less than the mutual concurrence of both parties could result in a rescission of the same ; and that, too, with the consent of the special judge.

2. And until said agreement was rescinded, there was no legal room for the appointment of a special judge by the governor, since it is not until after a failure of the parties to agree upon a special judge that the power of the governor to appoint arises. Code Cr. Proc., art. 571.

3. The mere fact that the county attorney, after he entered into the agreement mentioned, concluded that he would withdraw therefrom, would not work a rescission of said agreement, because the reason he assigned therefor — to

wit, that Wesley Pollard, who stood jointly indicted with appellant (but between whom a severance had been granted some four years before) — would not agree to the same judge as had already, long since, been agreed upon between the county attorney and appellant, is unsound in law.

4. A severance, once had, works a permanent severance of the joint case into two separate, independent, and distinct cases, and the acts had in one are in no way dependent on the acts had in the other.

*Thomas Ball*, Assistant Attorney-General, for the State.

WINKLER, J.   This appeal is from a verdict and judgment of conviction of murder in the first degree, with the death-penalty.   The indictment charges the appellant and one Pollard with the murder of one Joseph Shoemaker, alleged to have been committed in Dallas County, on July 1, 1876.   A severance having been granted, the appellant was tried before the Hon. Sawnie Robertson, special judge appointed by the governor to preside at the trial, the regular judge of the district being disqualified to try the case by reason of his having been of counsel therein prior to the time of his election as judge.

Two supposed errors in the proceedings below were urged on the trial, and the rulings of the court were perpetuated by bills of exception, and are presented and insisted upon in this court as grounds for reversing the judgment: 1. The defendant objected to being placed on trial before the special judge appointed, his objection being based mainly on the ground that counsel for the State and the defendant had agreed to select as judge for the trial another member of the Dallas bar.   The objection was overruled, and the defendant excepted to the ruling of the court.   2. The defendant pleaded that he had, at a former term of the court, been placed on trial on the same indictment for the same offence ; that he had once been placed in jeopardy, and could

not be again tried for the same offence. On demurrer by the county attorney, the plea of former jeopardy was stricken out, and the defendant excepted to this action of the court.

With reference to the first question, it seems that, prior to making application to the executive for the appointment of a special judge, a severance had been granted, and an agreement had been made to try the case before Judge Barksdale, or other special judge, as was conceded by the county attorney. The bill of exceptions, however, recites that he was unwilling to risk the agreement to select a special judge, and had this defendant's case, as well as that of Pollard, his co-defendant, certified up to the governor.

The argument of the appellant is, that the agreement of counsel to select a special judge, and they having made a selection of a special judge, was binding upon the State, and that the defendant had a right to demand to be tried before the special judge chosen by the parties to try the case, and ought not to be compelled to try before a special judge appointed by the governor. It does not appear from the bill of exceptions, or elsewhere in the record, that the agreement of counsel to select a special judge for the trial was made a matter of record, or reduced to writing, and the writing placed among the papers of the case. On the contrary, we are of opinion the inference is plain that whatever of agreement there was, was merely verbal; and, for aught that appears to the contrary, this may have been the very reason why the county attorney, in the proper discharge of duty, was unwilling to risk the agreement of counsel, and caused the fact of the disqualification of the regular judge to be certified to the governor for his action in the premises.

The Constitution specially prohibits any judge from sitting in any case wherein he shall have been of counsel, and provides, further, that when a district judge is disqualified by reason of any of the disqualifying causes enumerated,

" the parties may, by consent, appoint a proper person to try said cause." Art. V., sect. 1. The right of counsel to select a special judge is not confined, as was at one time supposed, to civil cases, but extends to criminal actions as well. *Early* v. *The State, ante* p. 476 ; *Davis* v. *The State*, 44 Texas, 523. It is also provided by the same article of the Constitution that, on a failure of counsel to select, " a competent person may be appointed to try the same, in the county where it is pending, in such manner as may be prescribed by law." The law has prescribed that, " should the parties not agree upon an attorney to try the case, on or before the day set for trial of the criminal docket, the district judge shall forthwith certify the facts to the governor, who shall at once appoint some practising attorney, learned in the law, to try such case." Code Cr. Proc., arts. 571, 572. " The attorney agreed upon or appointed, as provided in the two preceding articles, shall, before he enters upon his duties as special judge, take the oath of office required by the Constitution of the State, and his selection by the parties, or appointment by the governor, as the case may be, and the fact that the oath of office was administered to him, shall be entered upon the minutes of the court as a part of the record of the cause, and he shall have all the power and authority of the district judge that may be necessary to enable him to conduct, try, determine, and finally dispose of the case." These articles are preceded by art. 570, which gives authority to the parties or their counsel to select and agree upon an attorney of the court to preside as special judge in the trial, and thus avoid the necessity of a change of venue.

To our minds, the court did not err in holding that the State was not bound by what appears in the record on the subject of an agreement of counsel to select a special judge. That so important a step in the trial of a man on an issue involving his life, as the selection of a judge to preside at the trial, should be left to be settled by the vague and un-

certain recollections of counsel, seems to us incredible. If such a thing had really been determined upon, the agreement should have been perpetuated in some more definite and durable form. There is no controversy as to the fact that the district judge was disqualified on account of having been of counsel in the case. There is no sufficient evidence in the record as to what the counsel had agreed upon, or that they had definitely agreed upon anything, as to the selection of a special judge, within the time and in the manner prescribed by law; and hence we conclude, that the emergency which warranted the invocation of the governor had arisen, and from the record it is shown that the governor, acting under lawful authority, had appointed the judge who presided at the trial, and that he was sworn as required by law. The special judge was duly and legally appointed to sit as judge and preside at the trial.

The position of counsel, that the defendant had once before been placed in jeopardy and could not be again tried, though supported by an able and ingenious argument, in which numerous authorities are cited, is wholly untenable. The circumstances are briefly these: The defendant had previously been tried and convicted. On his own appeal the conviction was set aside, the judgment reversed, and the case remanded for a new trial. 4 Texas Ct. App. 44. The effect of this action of the Court of Appeals upon the defendant's case was to place his case in precisely the same condition as if the District Court had granted a new trial and there had been no appeal. Code Cr. Proc., art. 876. In such a case the doctrine of former jeopardy has no application whatever, for the simple reason that there had been no final adjudication of the case. *Vestal* v. *The State*, 3 Texas Ct. App. 648, and authorities there cited; *Simco* v. *The State, ante,* p. 338. The action of this court on the former appeal is known to us, and it is shown by the record that it was known to the court below on the present trial. The plea of former jeopardy was properly stricken out on the motion and demurrer of the county attorney.

The record shows that time was allowed counsel for the preparation of a statement of facts. Still, no statement of facts appears in the record. In the absence of this, our investigations are quite limited. Bills of exception taken to the rulings of the court below, which do not state the whole of the evidence on the question involved, cannot be revised in the absence of a statement of facts; and so, too, of charges of the court, whether given or refused. The practice has been so long settled on these subjects as not to require a reference to authorities in its support. From all we can gather from the record before us, aided by an elaborate brief by the appellant's counsel, we fail, from a patient and careful investigation, to discover any error which would warrant a reversal of the judgment. The appellant was tried in the court below upon a valid indictment for murder in the first degree, before a legal court. The charge of the judge sufficiently instructed the jury as to murder of the first as well as of the second degree, express malice and implied malice, and murder committed in the perpetration, or in the attempt at the perpetration, of robbery, with a very fair instruction as to the presumption of innocence and the reasonable doubt. It therefore becomes the duty of this court to affirm the judgment of the court below, and it is accordingly so ordered.

*Affirmed.*